Good morning, your honors. May it please the court. My name is Taylor Rentrosoff-Ryder, and I represent the petitioner, Mr. Victor Meza-Carmona. At this time, I'd respectfully request three minutes reserved for rebuttal. The issue in this case is whether the district court and lower courts erred in finding that Mr. Meza-Carmona does not qualify for derivative citizenship for failure to show that his mother continuously resided in the United States for one year. This court should reverse because Mr. Meza-Carmona's mother did live in the United States continuously for that one year period. This court in Guija v. Garland held that where there is a claim to citizenship, the claimant bears the burden of proving citizenship by a preponderance of the evidence. Further, under this court's decision in Mondacco-Vega v. Lynch, once the government has proven that first step of the test through presently convincing evidence of foreign birth, the burden then shifts to the petitioner to present substantial credible evidence of the citizenship claim. Ms. Rentrosoff-Ryder, if we agree with you that Mr. Meza-Carmona has established by a preponderance of evidence to shift the burden, should it go back to the district court for an opportunity for the government to then meet the third prong of our test in Mondacco-Vega? Your Honor, under the three-part test established by Mondacco-Vega, I do believe that the burden would switch to the government then to prove the removability. But would that have to occur in the district court on remand? Are you not claiming an opportunity for us to grant here if we agree with your arguments on the preponderance? Yes, Your Honor. I do believe that this court can decide that. The district court's review is specifically for the claim to citizenship. Counsel, I'm struggling with the burden of proof here. My understanding is that everybody seems to agree the government has provided enough information to shift the burden back to your client. And you, for example, rely upon the testimony primarily of Cedillo. She indicates that she lived in the United States for two years. She does not say continuously, and there are incidents of border crossing during that time. She was caring for a child, a young child, who is the mother in this case. There's nothing that I see in the evidence that we are looking at that says specifically, I lived in the United States. I never left here. I lived continuously. And my understanding of the regulation and of, indeed, an unpublished case in our circuit, that that's what has to be shown, that Victoria lived in the United States continuously for at least a year. I don't find that in any of the documentation. Can you help me with that? What says, who says that she lived continuously, not back and forth, but continuously in the United States after Victoria was born? Yes, Your Honor. Thank you. So, there are several parts that I'd like to address in this. So, yes, the court would find by preponderance of the evidence, more likely than not, that she lived continuously in the United States. And what the district court had before it was a birth certificate showing that Mr. Mesa Carmona's mother was born in the United States, August 21, 1947. The court then has the baptism certificate showing a nearly 11-month-old was baptized in El Paso, Texas. What we can reasonably infer, and she was born to two United States citizen parents, mother and father. There's no passport, nothing to show that between those 11 months that an infant was transported to Mexico. But, counsel, with respect, you seem to be suggesting that we have to infer that she stayed continuously. But I think the government has shown by border-crossing evidence that during that period of time that Cedillo did, in fact, cross the border. Since she had a small child with her, there's at least an equal presumption that she took her with them. So, again, I'm struggling with where there is evidence that is admissible, other than an inference, that Cedillo kept her, and Victoria was in the United States, continuously from the time of her birth until after that one-year period. What am I missing? Yes, Judge. If I may provide a timeline here, then. Ms. Cedillo does not take custody of Mr. Mesa Carmona's mother until after the baptism. So, we have the birth, we have the baptism, all of this time his mother was under the custody, or under the care of his mother. The affidavit provided by Ms. Cedillo specifically states that she did not take custody of the child of Ms. Carmona until after the baptism. Okay, but from the time of birth until after the one-year period, what do we look at that says, I had Victoria, and I stayed in the United States essentially for a period from birth through one year. I'm not finding that. What am I missing? So, we have the birth, and then we have the baptism certificate. She was born to a United States citizen mother and a United States citizen father. There's no passport in this record. So, counsel, I have to say I don't hear an answer to Judge Smith's question. I'm looking at the district court's finding at SCR 11 where the district court said, no one with personal knowledge of Ms. Carmona's whereabouts from her birth until her baptism has testified that Ms. Carmona was continually physically present in the United States during this period. And Ms. Cedillo's affidavit, which presumably was prepared for the purposes of the immigration proceeding or related to it, said Victoria lived with me approximately two years, but doesn't say, and Victoria never went to Mexico at any time during that period, or Victoria never went to Mexico between X date and Y date. So, given the standard of review, I think what Judge Smith respectfully, I'm not trying to put words in Judge Smith's mouth, I think what Judge Smith is looking for is something that says, here's the one-year period and the mom was in the United States the entirety of that. I don't see it either. And so, if you can answer Judge Smith's question as to what actually demonstrates that, I would be very interested. Yes, Judge. That's correct that there is nothing definite in the record to show that she had lived during that time. Under a factual finding for clear error, we look to see what's in the record in the entire evidence for a definite and firm conviction that a mistake has been committed, and including that as illogical, implausible, or without support in inferences. You seem to be suggesting, counsel, that we have to infer that and that that would meet the evidentiary standard. Is that correct? Your Honor, I do think that, yes, that the district court judge erred in failing to infer that she was a United States citizen born to two United States citizen parents. The mention of the border crossing card wouldn't come into play, Your Honor, until Ms. Cedillo, who was after the baptism. Ms. Renfro, I guess to help situate this, we've got 11 months, roughly, where there doesn't seem to be a real dispute over she's with her mother, it's up to the baptism. So then we're dealing with she needs to remain in the United States for 39 days after the baptism. The first evidence that she returned, and there's no evidence there that Ms. Cedillo had taken Victoria across the border, but the first card, if it shows that she reentered, is in December, several months after those 39 days. So we're disputing here whether there's evidence of where was Victoria during those 39 days. Is that right? That seems to be the dispute. Yes, Your Honor, and in regards to the border crossing card, I do believe that this warrants remand because the district court, as well as the parties in this case, seem to have been confused on exactly what the border crossing card meant. So this border crossing card is not akin to even a border crossing card in today's immigration law. What that is, it shows that Ms. Cedillo was a local permanent resident and was issued this card in El Paso, Texas in 1945. But Ms. Renfro, the border crossing card doesn't even show transit during the apical period. It's several months afterwards, isn't it? And so the government is the one who has custody of all of these records. Is that correct? Given the deaths and the distance of time, the government would be in the best position to show whether there was exit and reentry during the apical period. And the best they've come up with is a late December, well past the apical period, crossing card. Is that right? That is correct, Your Honor. That border crossing card doesn't show any entries, any exits. All of those dates that it just shows is an issuance date, which in today's passport, just because you were issued a passport on that date does not mean that that meant you reentered the United States on that date. Do the border crossing cards sometimes indicate whether the person is transiting with an infant? I think there are sometimes whether they're... The border crossing card at issue doesn't contain any evidence that, even outside this period, that Ms. Cedillo was crossing with anyone else. That's correct, Judge. It does not mention anything regarding Mr. Victor Carmosa, Mr. Mesa's mother. I want to get back to what we talked about before, because whether or not I agree with my colleague about the period that he says is undisputed, I think you said earlier, and I agree with you, that in order to fill in the blanks here, you have to infer. There is no direct evidence of a competent witness that can say she was here in the United States from the time of her birth until at least one year after. You have to infer that she was. And what is your best authority that we can do that in this case that would meet your client's burden of proof? Well, Your Honor, under the Mondega case, in reviewing the evidence to see if there was clear error, it calls to see if the district court then found that there was illogical, impossible, or without support in inferences that can be drawn from the facts. That's what I'm saying. You are relying on inferences to fill in the gaps, right? And what I'm asking is do you have any case law or any regulation that would indicate that that is permissible in meeting your client's burden of proof? I don't have any case law before me, Judge, to provide that to the court. However, I would note that the petitioner shouldn't need to provide evidence of every single day that this petitioner lived in the United States. And not to mention, Judge, this was in 1947. There were not iPhones. There were not digital cameras, camcorders, or anything like that that in today's society a mother or father would take pictures every day to show that this child resided in the United States every single day of that one-year period. But, Counsel, if Judge Johnstone is correct that the relevant period is 39 days, Ms. Cedillo had personal knowledge of what was going on during that 39 days, right? That is correct, Your Honor. And Ms. Cedillo could have said in her August 5, 1976 declaration, during that 39-day period, Mom was in my custody and never left the United States. She could have specifically stated that, Your Honor. However, in her affidavit, she states that after the baptism, she took custody of the child, and she states they specifically lived on the 8300 block of Alameda Avenue in El Paso, Texas. So she specifically states during that time in her custody, under the placement of child protective custody, that she lived in El Paso, Texas in the United States. Honestly, Counsel, if I had to draw an evidentiary inference from that, given the purpose of the declaration, I might actually draw an opposite inference from the fact that it would have been relatively easy to say that we never left the country during that period, and it doesn't actually say that. But there's no dispute, right, that this, and tell me if I'm wrong, that this affidavit was prepared specifically for immigration purposes. Your Honor, I apologize. I do not have knowledge of that to say yes or no. Do you want to say the balance of your time, Counsel? Yes, Judge. Thank you very much. Very well. All right. Let's hear from the government. May it please the Court. Robert Tennyson for the government again. There are sympathies in this case. I mean, we're talking about a case that arose around, you know, the facts of which are from 1947 and 1948. And it's hard to find documents for this period or people who are still around who can testify, you know, directly about the events. But Congress was clear in requiring people to establish one year of continuous physical presence. And there's no clear error in the district court judge's finding that that one year was not shown. Let me ask you this. I asked your friend on the other side whether she knew of any case law or regulation that would permit us to infer that Victoria was in the United States continuously from her birth until the one-year period had passed. Are you aware of any such case law? I'm not aware of any case. I'm not aware of any statute. The immigration judge, I mean, the district court judge could have read the evidence and come to the conclusion, you know, and could have drawn normal evidentiary inferences and come to the conclusion that he was here for a year. I don't think that the district court judge was precluded from doing that. But the district court judge looked at the evidence and said. And they have to show clear error, right? And that's a clear — and the thing is clear error. This is a clear error case. What else would a petitioner need to bring to the court to establish that an infant is continuously present beyond — for these remaining 35 days, we have the birth certificate, we have the baptismal certificate. Right. And given that the government has only come up with an entry card that was outside this period, what else do they need to show? Was it simply the magic words of continuous presence? How else are we supposed to know where an infant is in her first year? So I think the appropriate response would have been the petitioner lived with me these days and I didn't go to Mexico. Or the petitioner lived in the United States continuously during these periods. It doesn't have to be the specific words. Also, the district court judge not only found for the final 39 days, but during the period between the birth certificate and the baptismal certificate, that there's no evidence put forward of continuous physical presence during this period as well. What evidence would look like? What would that look like again? I mean, we could have had evidence from, say, the petitioner's, let's say, aunt or someone else in the family who said, oh, petitioner never arrived in Mexico at the grandparents until such and such date. I was there. You know, I kept track of her. Or of the parents who disappeared at some point, some statement or affidavit that she was there. If you could have had some evidence from, you know, if you have evidence of her residing, you know, there needed to have been somebody saying she was here every day from the time she was born until a year later. Or from some, you know, for one year. And we just don't have that. And in the absence of that, the district court judge in sort of with regard to the petitioner's mother's testimony, she's not consistent as the district court judge.  We can set aside the mother's testimony on both sides. But so, I mean, from what did the district court draw? We're dealing with inferences on both sides. So from what could the district court draw an inference that she had left when there's no evidence in the record that she did? But it's not an inference that she left. There has to be some evidence that she stayed. That's all. How does that fit with that? Yeah. I mean, I think this is helpful. We've got this burden-shifting framework. Right. I guess we're trying to understand in terms of right now we're at, we're asking whether they met the second step. Right. Is the evidence that she left or stayed, are we arguing about the third step there? Or are we arguing whether she satisfied the second step? Whether she satisfied the second step. Whether or not there's a substantial credible evidence of her having been in the year for that. I want to go back to what my colleague Judge Bennett said before. As noted, Ms. Zedillo signed a declaration. She was with counsel that was intended for the purposes of this proceeding. They knew what the standard was, and yet she did not say that Victoria was with her continuously during that one-year period. Right. To the degree there are inferences drawn, can we draw the inference that she was unable to say so because she couldn't accurately do so? This court is certainly free. And she offered the statement. I think the statement that we're talking about is one that was offered to the INS back in 1994, 1995. But the 76th affidavit. The 76th, yes. And that comes at the, I mean, it appears to be connected because we have, although we're not relying on it, we have the July 7, 1976 internal memorandum of mom's interview. Correct. And then this is August 5, 1976, less than a month later, and submitted apparently in the immigration proceeding back then or something back then. Right. Is there anything in the record which suggests that this August 5, 1976 affidavit was unconnected to the immigration proceeding? It was sent to INS. The petitioner had sought an N-600 back in the mid-'70s. And the original, and it was an INS interview with the petitioner. She, not the petitioner's mother, she came in, she said, I left shortly after I was born, went to Mexico.  But we can't consider that. But this is all within the context of that N-600 application. Okay. So the August 5, 1976 affidavit, SCR 97, that there is evidence that that was submitted to the service or predecessor in connection with the immigration discussion of when she was in the country and when she wasn't. That is correct, Your Honor. Okay. Thank you. Mr. Tennyson, I guess we've heard some decent arguments about what the declaration might have said or didn't say. That's not what the district court relied on. The district court required corroboration. Is there any legal requirement that Ms. Adio's affidavit be corroborated before the district court disregarded it? I mean, the district court can make findings and find that the petitioner, that that statement is insufficient in and of itself to substantiate the point being made. Well, you used the word, I think, corroboration. How is that not legal error in terms of evaluating the evidence? They didn't say the affidavit didn't say enough about continuous presence every day during these 39 days or the prior year. They said there's no corroboration here, but otherwise would seem to have credited that as evidence in the petitioner's favor. But the district court further went on to state that there's no indication that she remained in the country continuously during that period. And then the documents that were there had to corroborate that. But that is the indication, is it not? And so if the district court disregards it because it's not corroborated and there's no corroboration requirement, how is that not error? I think first the district court went on to look at what potentially could have corroborated it. Don't forget it corroborated it. It was the petitioner that submitted originally the border crossing cards to the district court. And the way the border crossing cards work is first it's a person who has to be in or at least the particular form and type of border crossing card is one given to LPRs to facilitate transit back and forth across the border for someone who lives there very closely. You obtain them for a six-month period. At the time you would obtain them, you would get them for a six-month period, and then you'd re-up them. And so each of these dates here, these revalidations, is a six-month extension of the border crossing card. Because the extension from December would have been for the following six months, and that's outside the period. So was there a border crossing card produced by the government which has custody of these, establishing that one was in effect at the time? Yes. Look at SER 112, and you can see that the border crossing card is originally issued in 1945. It's reissued again in June of 1945, reissued in December of 45, June of 1946, December of 1946, June of 1947, December of 1947, June of 1948. And then at SER 14, again, she gets an extension to December of 1948. It gets a new border crossing card for December of 1948. So there's a series of border crossings. There's a border crossing card. Before that, with a series of reissuances all the way up until you have the December 1948 new border card being issued. So, yes. Counsel, with regard to my colleague's question, as I understand what Judge Bolton was saying with regard to Ms. Cedillo's affidavit, it doesn't say that mom was in the country continuously. It's not direct evidence supporting what petitioner's burden is. So he's saying that because Judge Bolton said that, Judge Bolton then went on to look at the remainder of the evidence and see if that could support a finding. And did that solely because Ms. Cedillo's affidavit didn't go to what Judge Bolton found was the key point? Was she there without ever leaving? That is correct, Your Honor. So the district court judge essentially said we don't have anything that shows continuous, and it's her burden and it is his burden to establish that continuous physical presence. There's nothing here in this declaration that says that. Let's move on and start looking at the physical evidence. So, yes. If this court has no further questions for me, the government rests. Thank you so much. Very well. All right. Counsel, you've got a little bit of time. Thank you, Judge. I do believe that under de novo review and clear error that there were inferences that could have been drawn that this court needs to consider that Mr. Mesa Carbona's mother was an infant in the United States, born in the United States to two United States citizen parents. We have a birth certificate showing birth in the United States, a baptism certificate showing baptism in the United States. We have affidavits from adults who have personal knowledge of her whereabouts in the United States, but also testimony that she was in the care of Child Protective Services after the baptism. Now, a person that's placed under Child Protective Services is not going to be allowed to be transported to Mexico while under an investigation while her mother is being investigated. Evidence has been shown that the court should be able to infer that a United States citizen, born to United States citizen parents, continuously resided in those affidavits as well. But, Counsel, I think you agreed before that in order to get where you need to go, we need to infer something, and there's no case law or regulation that you can cite us to that permits us to do that. Is that right? That is correct, Your Honor, but as I also argued, it shouldn't be expected of the petitioner to show every single day of living in the United States. You can take what was provided as well as the affidavits of adults who had knowledge of the whereabouts of this child to show that there was no reason for this child to have been transported to Mexico, and that border crossing card that we make a lot of reference to do not show any entries or exits of an infant out of the United States to break that continuous prejudice. We've let you go a little over time, but let me ask my colleague whether either has additional questions. Thanks to both counsel for your argument, and the case, Kate just argued, is submitted.
judges: SMITH, BENNETT, JOHNSTONE